UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| JESSICA PRESTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6:22-CV-015-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| KENTUCKY CONSULAR CENTER, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on a Motion to Dismiss filed by Defendants Kentucky Consular Center, Antony Blinken, Secretary of the United States Department of Labor, and the United States, [R. 31]. Plaintiffs responded, [R. 49], and Defendants replied, [R. 60]. This matter is now ripe for review. For the reasons stated herein, the Court will grant Defendants' Motion.

## I.   BACKGROUND

Plaintiffs in these two consolidated cases[1] are winners of the 2022 diversity visa program. [R. 9, p. 11, ¶ 72; R. 23]. The Kentucky Consular Center ("KCC") granted Plaintiffs permission to file electronic immigrant visa applications, using Form DS-260, for the opportunity to immigrate to the United States of America as permanent residents. [R. 9, pp. 9, 11, ¶¶ 54, 73]. Plaintiffs, as diversity visa selectees, claim that they have filed their DS-260 applications and submitted additional supporting documents to the KCC. *Id*. ¶¶ 56, 72–73. As a result, Plaintiffs assert they are "documentarily qualified as diversity immigrants" and are

---

[1] The two consolidated cases are *Husu, et al. v. Kentucky Consular Center, et al.*, 6:22–CV–00016–CHB–HAI and *Preston, et al. v. Kentucky Consular Center, et al.*, 6:22–CV–00015–CHB–HAI. As a result, the Amended Complaint in *Preston*, [R. 9], is the operative complaint.

waiting for the Department of State ("Department") to schedule visa interviews to complete the visa process. [R. 49, p. 16]. Plaintiffs argue that despite being documentarily qualified, "Defendants refused or failed to schedule interviews of Plaintiffs in a reasonable manner in compliance with the law." *Id.* In *Preston*, there are 23 Plaintiffs, each of which is a winner of the 2022 diversity program, waiting to be interviewed at the consulate in Sydney, Australia. *Id.* In *Husu*, there are 103 Plaintiffs, each of which is a winner of the 2022 diversity program, waiting to be interviewed at various consulates throughout the world. *Id.* at 17. Importantly, approximately 40 percent of the Plaintiffs in this consolidated matter have been dismissed because their visa applications have been adjudicated.[2] *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79].

Plaintiffs in both *Preston* and *Husu* filed their Complaint on February 1, 2022. [R. 1 (015); R. 1 (016)]. On February 18, 2021, Plaintiffs in both cases amended their Complaint ("Amended Complaint") as a matter of right pursuant to Federal Rule of Civil Procedure 15(a)(1). [R. 9 (015), R. 11 (016)]. On March 8, 2022, the Parties filed a Joint Motion to Consolidate Cases. [R. 25 (016)]. This Court granted the Joint Motion to Consolidate four days later, finding that:

> the two actions are based not merely on analogous factual circumstances, but follow from the same type of underlying events. *See also MacLean v. Evans, Mechwart, Hambleton & Tilton, Inc.*, No. 2:09-CV-521, 2009 WL 2983072, at *1–2 (S.D. Ohio, Sept. 14, 2009) (finding it appropriate to consolidate multiple age discrimination claims where some of the evidence would overlap). The Plaintiffs in both actions contest the manner in which Defendants have implemented the 2022 Diversity Visa Program. [R. 1, pp. 76–86, ¶¶ 809–894]; 6:22-CV-015-CHB [R. 1]. Additionally, the Plaintiffs in each case are represented by the same counsel and seek relief against the same set of Defendants, who are also represented by the same counsel. *See Brown v. Dejoy*, No. 3:19-CV-615-DJH-CHL, 2021 WL 6882225 (W.D. Ky. June 11, 2021) (citing *Basler v. Purcell Tire & Rubber Co.*, No. 4:10-CV-231-RWS, 2010 WL 1608858, at *1 (E.D. Mo. Apr. 20, 2010)).

---

[2] At the time of this Order, 53 of the initial 134 Plaintiffs have had their applications adjudicated.

[R. 27 (016), p. 2].

In their Amended Complaint, Plaintiffs presented four claims against Defendants: (1) violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), for the unlawful or unreasonable withholding of interviews (Count One); (2) violations of the APA, 5 U.S.C. § 706(1), for the unreasonable delay of scheduling interviews (Count Two); (3) violations of the APA, 5 U.S.C. § 706(2)(A), based on Defendants' arbitrary, capricious, and unlawful interpretation that the Immigration and Nationality Act requires the government to prioritize other immigrant applicants ahead of diversity visa immigrant applicants (Count Three); and (4) violations of the APA, 5 U.S.C. § 706(2)(A), based on Defendants' arbitrary, capricious, and unlawful decision-making regarding scheduling of interviews that have not been made in good faith, failure to consider relevant factors, and failure to comply with the regulatory process that governs the allocation, interviews, and issuance of diversity visas (Count Four). [R. 9, pp. 31–44, ¶¶ 313–421]. Notably, in their Response, Plaintiffs somewhat pivot from their claims as written in the Amended Complaint, in particular for Counts Three and Four, and reorient their claims to attack the form, manner, and timeframe in which diversity applications are being processed. Plaintiffs summarize their claims in their Response as follows:

> The first two causes of action relate to Defendants [sic] failure to act, or unlawfully withholding action, in scheduling interviews before the statutory deadline to ensure that Plaintiffs can avail themselves of the administrative process to obtain diversity visas before the end of the fiscal year. Relatedly, in their third cause of action, Plaintiffs claim Defendants have violated the APA, 5 U.S.C. § 706(2)(A), because they have acted contrary to law in deprioritizing diversity visa applicants vis-à-vis other applicants for interviews and failed to follow the INA and governing regulations for diversity visas. Plaintiffs specifically allege that, beyond deprioritizing diversity visa applicants, Defendants have unlawfully issued visas to those who were not eligible and scheduled interviews out of the regulatory-mandated order of consideration.
>
> In their fourth cause of action, Plaintiffs have alleged that the Department of State's deprioritizing diversity visas violates the APA, 5 U.S.C. § 706(2)(A), because it represents an arbitrary and capricious action taken contrary to law.

3

Plaintiffs specifically alleged that Defendants misapplied the INA and failed to consider relevant factors, including the time-sensitive nature of diversity visas, by departing from the Department of State's historical treatment of diversity visa applicants. Those applicants have historically received approximately 9% of the immigrant visas issued worldwide in accordance with the Congressional allocation of visas and intent that all categories share the same priority. In departing from the statutory requirement and historical practice, Defendants' arbitrary and capricious actions have prejudiced Plaintiffs as the time-sensitive nature of the diversity visa process extinguishes eligibility – this is true whether the unlawful action takes place in the beginning, middle, end or throughout the entire fiscal year.

[R. 49, pp. 23–24 (internal citations omitted)].

On April 26, 2022, the Defendants filed a Motion to Dismiss, [R. 31]. Plaintiffs filed a Response in Opposition on May 11, 2022, [R. 49]. Defendants replied, [R. 60]. This matter is now ripe for review. Before discussing the merits of the case, the Court will first provide a basic background of the diversity visa program and the impacts on the program following the emergence of the COVID-19 pandemic.

## A. The Diversity Visa Program

Generally, a foreign national wishing to enter the United States must first obtain a visa from the Department. A visa is "a travel document that allows its holder to travel to a port of entry and request permission to enter the United States, but it does not guarantee the right to enter the country." *Gomez v. Trump*, 485 F. Supp.3d 145, 158 (D.D.C. 2020), *amended in part*, 486 F. Supp.3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, No. 20–CV–01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021); *see also* 8 U.S.C. § 1201(h); *Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (summarizing "the basic distinction between admissibility determinations and visa issuance that runs throughout the INA"). Congress created three types of immigrant visas: (1) family based; (2) employment based; and (3) diversity based. *See* 8 U.S.C. § 1153; [R. 9, p. 6, ¶ 37]. This case concerns diversity visas, a type of

immigrant visa available under the INA. The diversity-visa program makes as many as 55,000

visas available annually to citizens of countries with low rates of immigration to the United

States. *See* 8 U.S.C. §§ 1151(e), 1153(c). For the 2022 Fiscal Year ("FY"), the Department

selected 63,753 selectees, plus their derivative beneficiary spouses and children, totaling 118,513

prospective diversity visa applicants for the limited slots. [R. 31, p. 18; R. 31-1, p. 3, ¶ 4; R. 9, p.

10, ¶ 62].[3]

    "The process by which the State Department awards diversity visas is competitive and

complicated." *Almaqrami v. Pompeo*, 443 U.S. App. D.C. 52, 933 F.3d 774, 776 (2019). Given

the demand for diversity visas, the Department requires an applicant to apply and win the

diversity visa "lottery." 8 U.S.C. § 1153(e)(2). The chances of winning the lottery are slim.[4] A

lottery winner or "selectee" is entitled to apply for an immigrant visa by following the

Department's instructions for filing a Form DS-260 and supporting documents. *See* 22

C.F.R. § 42.33(b)–(c). A selectee is eligible to receive a visa number only during the fiscal year

---

[3] The Court takes judicial notice of the FY 2022 diversity visa statistics. Federal Rule of Evidence 201 governs judicial notice of "adjudicative facts." "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Further, the Court may take judicial notice of public documents and government documents because their sources "cannot reasonably be questioned." *Id.*; *see also Nikolao v. Lyon*, 238 F. Supp. 3d 964, 977 (E.D. Mich.), *aff'd in part, vacated in part on other grounds*, 875 F.3d 310 (6th Cir. 2017) ("Without converting a Rule 12(b)(6) motion to dismiss to a motion for summary judgment under Rule 56, a court can take judicial notice of "public records and government documents available from reliable sources on the internet, such as websites run by governmental agencies." (quoting *U.S. ex. Rel. Modglin v. DJO Global, Inc.*, 48 F. Supp.3d 1362, 1381 (C.D. Cal. 2014) (internal quotations omitted)). Though they lack the specificity and fail to cite to a government website or authority, Plaintiffs also cite to government-held statistics for the FY 2022 diversity visa program. [R. 9, p. 10, ¶ 62; *see also Gomez I*, 485 F. Supp.3d at 159 ("Millions of hopefuls enter a lottery for the chance to apply for one of the 55,000 allotted diversity visas."); *Liudmyla Pushkar, Plaintiff, v. Antony Blinken, et al., Defendants, No. CV 21–2297 (CKK), 2021 WL 4318116, *2 (D.D.C. Sept. 23, 2021)* (noting that "[d]emand for diversity visas regularly outstrips supply" and that 137,969 diversity visa applicants for the FY 2021 Diversity Visa program sought one of 54,850 available visas (internal quotations omitted)). The Court will take judicial notice of the government's statistics because the information provided both by Plaintiffs and Defendants is "not subject to reasonable dispute." Fed. R. Evid. 201(b). Though the Court need not rely on Defendants' attached affidavit for this information, it cites the figures found therein due to the lack of specificity found in Plaintiffs' figures. Finally, Plaintiffs do not contest the figures cited.
[4] For example, in Fiscal Year 2018, there were approximately 14.7 million qualified entries. *Gjoci v. Dep't of State*, No. 1:21–CV–00294–RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021).

in which he applied and was selected. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(II) ("Aliens who qualify, through random selection, for a visa under section 1153(c) [8 U.S.C. § 1153(c)] shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.").

Congress prescribed, "[e]very alien applying for an immigrant visa . . . shall make application thereof in such form and manner and at such place as shall be by regulations prescribed," 8 U.S.C. § 1202(a), and directed, "[w]henever any person makes application for a visa … the burden of proof shall be upon such person to establish that he is eligible to receive such visa." *Id*. § 1361. Normally, selectees file their applications and supporting materials with the KCC, which is responsible for several aspects of diversity visa processing, including the issuance of visa numbers. *Gjoci v. Dep't of State*, No. 1:21–CV–00294–RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021); *see also* [R. 9, p. 9, ¶ 55]. Thus, in prior fiscal years, the KCC reviewed all biographical and documentary information for completeness, apparent inconsistencies, and potential indicators of fraud, and assessed each applicants' submission before deeming them "documentarily qualified." *Gjoci*, 2021 WL 3912143, at *2; *see also* [R. 31, pp. 19–20]. A selectee is "documentarily qualified" for purposes of scheduling a visa appointment when the KCC confirms that the applicant has properly completed and submitted the DS-260 and all documents are "received and reviewed." 9 Foreign Affairs Manual ("FAM") 502.6-4(d)(1)(B). Visa numbers are allocated to selectees "who are within the applicable rank cut-off for that month and have been reported documentarily qualified." 9 FAM 502.6-4(c)(2)(C).

The KCC contacts documentarily qualified applicants to schedule an interview when their regional lottery rank number is about to become "current" under the Department Visa Bulletin. *See, e.g.*, 9 FAM 502.6-4(d)(2). Current visa number in hand, the applicant may

schedule an interview with a consular officer, and assuming the selectee meets the criteria to obtain one, the Department shall issue him a diversity visa. 8 U.S.C. § 1153(c), (e)(1); 22 C.F.R. §§ 40.6, 42.81(a); *see* 8 U.S.C. § 1202(h). Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the selection fiscal year. 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II);  22 C.F.R. § 42.33(a)(1), (d); *see* 31 U.S.C. § 1102.

Importantly, "a visa interview is scheduled only if the visa number for the applicant's country, region, and rank order is current per the information in the Visa Bulletin." *Gjoci*, 2021 WL 3912143, *2; *see also* C.F.R. § 22.51(a)(b). In addition, the availability of interview appointments may depend on the available resources and competing demands of consulates in an applicant's country of residence. *See Gjoci*, 2021 WL 3912143, at *2; *Liudmyla Pushkar, Plaintiff, v. Antony Blinken, et al., Defendants*, No. CV 21–2297 (CKK), 2021 WL 4318116, *2 (D.D.C. Sept. 23, 2021). This is because, "[u]nless otherwise directed by the Department, an alien applying for an immigrant visa shall make application at the consular office having jurisdiction over the alien's place of residence[.]" 22 C.F.R. § 42.61(a). Selectees are scheduled in order of their rank number. [R. 31, p. 18]; *see also* 22 C.F.R. § 42.33(e). A diversity visa is generally valid for six months after issuance. 8 U.S.C. § 1201(c).

## A.  Effect of the COVID-19 Pandemic on Consular Processing

COVID-19 greatly affected the operations of U.S. embassies and consulates. Consequently, the Court offers a brief description of the subsequent developments that occurred because of pandemic.

Beginning in March 2020, the Department suspended routine visa processing services due to the COVID-19 pandemic, limiting embassies and consulates to processing visa cases

deemed "emergency" or "mission critical." *Gomez I*, 485 F. Supp.3d at 160; *see also* Dep't of State Bureau of Consular Affairs, *Suspension of Routine Visa Services,* https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-news-archive/suspension-of-routine-visa-services.html (last visited June 7, 2022).[5] Diversity visas were excluded from these definitions. *Gomez I*, 485 F. Supp.3d at 160.

In April 2020, then-President Donald J. Trump issued Presidential Proclamation 10014, which temporarily suspended the entry of immigrants into the United States pursuant to 8 U.S.C. §§ 1182(f), 1185(a). 85 Fed. Reg. 23,441 (Apr. 27, 2021); *see Gomez I*, 485 F. Supp.3d at 161. This suspension was subsequently extended through March 31, 2021 by Presidential Proclamation 10052, 85 Fed. Reg. 38263 (June 25, 2020) and Presidential Proclamation 10131, 86 Fed. Reg. 417, 418 (Dec. 31, 2020). Although these Proclamations provided certain exceptions in "the national interest" to the general suspension of immigrant entry, there was "no specific national interest exceptions available for diversity visa applicants[.]" *Gomez I*, 485 F. Supp. 3d at 162. The Department interpreted these proclamations and associated guidance as "suspend[ing] not only entry but also the issuance of visas ... not subject to one of the enumerated exceptions." *Id.*

In July 2020, the Department issued guidance, known as the Diplomacy Strong Framework, that created a phased approach to the resumption of routine visa-processing services. *Gomez I*, 485 F. Supp.3d at 161; *Filazapovich*, 560 F. Supp.3d at 217.; *see also* Dep't of State Bureau of Consular Affairs, *Suspension of Routine Visa Services,* https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-news-archive/suspension-of-routine-visa-services.html (last visited June 7, 2022). Under the three-

---

[5] The Court takes judicial notice of this government website. *See* Fed. R. Evid. 201(b).

phase approach, diversity visas could not be processed until a consular post reached "Phase

Three," and even then, the consular post was constrained by Proclamation 10014. *Gomez I*, 485

F. Supp.3d at 161. On November 1, 2020, the Department issued new visa-processing guidance,

setting in place a tiered and hierarchal prioritization scheme. *Filazapovich*, 560 F. Supp.3d at

218; *see also* Dep't of State Bureau of Consular Affairs*, Immigrant Visa Prioritization,*

https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-prioritization.html.[6]

Although its earlier July 2020 guidance "provides important context and structure," consular

posts "are no longer obligated to be in a specific . . . phase to adjudicate a particular visa class as

described in the prior guidance." *Filazapovich*, 560 F. Supp.3d at 218. Pursuant to the November

2020 guidance, diversity visa processing remained relegated to the lowest priority tier. The tiers

for immigrant visa services were:

> Tier One: Immediate relative intercountry adoption visas, age-out cases (cases where the applicant will soon no longer qualify due to their age), and certain Special Immigrant Visas (SQ and SI for Afghan and Iraqi nationals working with the U.S. government)
>
> Tier Two: Immediate relative visas; fiancé(e) visas; and returning resident visas
>
> Tier Three: Family preference immigrant visas and SE Special Immigrant Visas for certain employees of the U.S. government abroad
>
> Tier Four: All other immigrant visas, including employment preference and diversity visas.

*Gjoci*, 2021 WL 3912143, at *4. Underlying the Department's guidance was a policy to

prioritize certain applications for immediate family members to ensure family reunification[7].

*Pushkar*, 2021 WL 4318116, *3.

---

[6] The Court takes judicial notice of this government website. *See* Fed. R. Evid. 201(b).
[7] When articulating its rationale for the prioritization scheme, the Department noted: "The guiding principle on which we have based immigrant visa prioritization is that family reunification is a clear priority of the U.S. Government's immigration policy, a priority [that] is expressed in the Immigration and Nationality Act (INA)." Dep't of State Bureau of Consular Affairs*, Immigrant Visa Prioritization,*

On February 19, 2021—after the transition of presidential administrations—the Department issued revised guidance on "Scheduling and Prioritizing Immigrant Visas and Diversity Visa Cases." *Id*. The guidance incorporated the tiered prioritization framework announced in November 2020 and emphasized that visa-processing posts should continue to maximize their resources to schedule as many family-based visa and fiancé visa appointments as possible, focusing on reducing any Immediate Relative visa backlog each month, as resources allow. *Id.* (citation and quotations omitted). But posts with "immediate relative backlogs" were instructed to "schedule some ... Diversity Visa . . . cases each month considering the backlog, if any, for each type of case[.]" *Id.* (quoting *Filazapovich*, 560 F. Supp.3d at 218).

On February 24, 2021, President Joseph R. Biden issued Proclamation 10149, which revoked Proclamation 10014 and the portions of Proclamations 10052 and 10131 that had extended the "entry ban" to diversity visa holders. *See* 86 Fed. Reg. 11,847 (Feb. 24, 2021).

In September 2021, the Department replaced the November 2020 guidance with the COVID 19 Mitigation Process ("CMP"). [R. 31, pp. 23–24; R. 31-2, pp. 10-11, ¶ 18; 21 STATE 99942][8]. The CMP shifts the focus on operational status from strictly controlling what percentage of employees can be present in the office to more holistic decision-making on workforce posture and mitigation measures by reviewing four local risk indicators: COVID-19 community transmission; employee vaccination status; local hospital capacity; and local conditions. *Id.*

---

https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-prioritization.html. Though the prioritization scheme has since been rescinded, family reunification remains a cornerstone of U.S. immigration policy. *See* H. Rept. 101-723 pt. 1 (1990) at 43. Accordingly, the Court may take judicial notice of this House Report because it is a reliable government document.

[8] Plaintiffs do not challenge the CMP either in their Amended Complaint or their Response. The Court offers information regarding this policy shift to provide a full picture of the policies currently in place. *See also* Fed. R. Evid. 201(b).

Finally, in December 2021, the Department initiated a pilot program for the 2022 Fiscal Year selectees ("December 2021 Decision"). [R. 31, p. 20]. The pilot program modified the document submission requirements. Pursuant to the December 2021 Decision, a selectee is only required to submit a DS-260 to KCC as a prerequisite for interview scheduling. *Id*. As a result, selectees now will submit the required supporting documents to the consular post where the applicant will make their visa application. *Id*.; *see also* Dep't of State Bureau of Consular Affairs, *Diversity Visa 2022 Update*, https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-2022-update.html (last visited June 7, 2022). As a result, the KCC now reviews the submitted DS-260s for completeness rather than documentarily qualification.

Given that the Presidential Proclamations declaring and extending an "entry ban" has been revoked and the November 1, 2020 guidance setting in place a tiered and hierarchal prioritization scheme has been rescinded, only the CMP and December 2021 Decision remain relevant to this matter. Importantly, neither of the two policies deprioritizes diversity visa applications. That is, neither the CMP nor the December 2021 Decision places Plaintiffs at the bottom of any alleged immigrant-visa hierarchy.

### A. Recent Updates on Visa Processing

The record in this matter demonstrates that the Department and KCC have continued to execute their statutory purpose to process immigrant visa applications since Plaintiffs filed their Amended Complaint. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79]. By May 20, 2022, 22 out of the initial 134 Plaintiffs had been voluntarily dismissed from this matter because consular officers had adjudicated their visa applications. [9] *See* [R. 25; R. 58]. On June 29, 2022, 14

---

[9] When Defendants filed their Reply to Plaintiffs Response, they noted that 52 out of the 112 Plaintiffs' rank numbers only became current since April 1, 2022 (41 on April 1, 2022, 7 on May 1, 2022, and 5 on June 1, 2022), and they were not eligible to be scheduled for an interview prior to their rank numbers becoming current. [R. 60,

Plaintiffs filed a notice of voluntary dismissal because they had been interviewed for a diversity visa. [R. 67]. Two more Plaintiffs dismissed their claims on June 30, 2022. [R. 69]. On July 27th, 14 Plaintiffs dismissed their claims because they have been interviewed for a diversity visa. [R. 76]. Finally, one additional Plaintiff was voluntarily dismissed on July 29th, 2022. [R. 79]. In total, the notices of voluntary dismissal filed in the record demonstrate that approximately 53 out of the initial 134 Plaintiffs (40 percent) have been voluntarily dismissed because the Department has adjudicated their diversity visa applications. Further, several weeks remain to schedule interviews before the September 30, 2022 deadline.

More generally, as of June 23, 2022, the KCC had completed processing of 48,045 FY22 diversity visa cases, associated with 101,280 prospective applicants. [R. 62; R. 62-2; R. 31, p. 18; R. 9, p. 10, ¶ 62]. By the same date, KCC had also scheduled interviews for 26,373 FY22 DV cases, associated with 55,034 prospective applicants. *Id*.

## II.   STANDARD OF REVIEW

### A.   Federal Rule of Civil Procedure 12(b)(1) – Lack of Subject Matter Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may seek the dismissal of action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The moving party may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction. *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack "questions merely the sufficiency of the pleading." *O'Bryan v. Holy See*, 556 F.3d 361, 375 (6th Cir. 2009). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).

---

p. 5]. Defendants also highlighted that eight Plaintiffs, as of May 25, 2022, were not yet eligible to be scheduled for an interview because their rank numbers were not yet current. *Id.*

Alternatively, a factual attack challenges the factual existence of subject matter jurisdiction. *Id*. In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

Importantly, when faced with a 12(b)(1) challenge, plaintiff bears the burden of establishing subject-matter jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). Plaintiffs cannot meet this burden through unsupported assertions as "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *O'Bryan*, 556 F.3d at 376 (citations omitted). If the allegations in the Complaint establish federal claims, the exercise of subject-mater jurisdiction is proper.

**B. Federal Rule of Civil Procedure 12(b)(6) – Failure to State A Claim**

A pleading that states a claim for relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleadings require plausible allegations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When a complaint is attacked by a 12(b)(6) motion to dismiss, the court must "construe [the] complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of [their] claim that would entitle . . . relief." *Hall v. Callahan*,

13

727 F.3d 450, 453 (6th Cir. 2013). However, these principles are inapplicable to legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. Nor does an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "shown"—"that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## III.  ADMINSTRATIVE PROCEDURE ACT

Each of Plaintiffs' claims involve assertions that Defendants violated some provision of the Administrative Procedure Act ("APA"). *See* [R. 9, pp. 31–44, ¶¶ 313–421]. The APA authorizes suit by a "person suffering [a] legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Where no other statute provides a private right of action, the "agency action" complained of must be "final agency action." *Id*. § 704. "[A]gency action" includes "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"[10]. *Id*. § 551(13). The APA provides relief for agency action in § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1). "However, consistent with underlying separation of powers considerations, 'a claim under [section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.'" *Kaufman v. Mukasey*, 381 U.S. App. D.C. 21, 524 F.3d 1334, 1338 (2008) (citation and quotations omitted) (emphasis in original).

---

[10] A claim for a "failure to act" must show "the omission of an action without formally rejecting a request – for example, the failure to promulgate a rule or take some decision by a statutory deadline." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004).

Further, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 7 U.S.C. § 706(2)(A). A reviewing court's analysis of an agency's decision under an arbitrary and capricious standard is a narrow one. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In determining whether an agency action is arbitrary and capricious under the APA, courts "determine only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, --- U.S. ----, 139 S.Ct. 2551, 2569, 204 L.Ed.2d 978 (2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). However, a court "may not substitute [its] judgment for that of the [agency], but instead must confine [itself] to ensure that [the agency] remained 'within the bounds of reasoned decisionmaking.'" *Dep't of Com.*, 139 S. Ct. at 2569 (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

## IV.   ANALYSIS

### A.  COUNTS THREE AND FOUR

#### 1)  12(b)(1) – COMMITTED TO AGENCY DISCRETION BY LAW

As a preliminary matter, the Court seeks to elucidate Counts Three and Four, as they are not a model of clarity. After countless review, the Court continues to scratch its proverbial head when trying to understand what Plaintiffs are challenging. Though Count Three argues that "Defendants' . . .  unlawful interpretation that the [INA] requires the government to prioritize other immigrant applicants ahead of diversity visa immigrant applicants," [R. 49, pp. 17–18], Plaintiffs have failed to tether their argument to a policy or decision made by Defendants that actually deprioritizes diversity visa applicants. Nor could they, as the Department rescinded the

November 2020 prioritization guidance and replaced it with the CMP in September 2021. [R. 31, p. 23]. Noticeably absent in Count Three of the Amended Complaint is any mention of a policy that deprioritizes diversity visa applications. In fact, the words "prioritize" or "deprioritize" are never mentioned except in the subtitle for the cause of action. [R. 9, pp. 41–43, ¶¶ 386–403]. Instead, Plaintiffs claim that "Defendants' implementation of the 2022 DV program, including the pilot program [the December 2021 Decision], lacks a rational connection to the choices made to choose among eligible candidates for interviews." *Id.* at 41, ¶ 391. As the Court will discuss below, Plaintiffs impermissibly rely on naked assertions to support this claim. Importantly, the "pilot program," known as the 2021 December Decision, does not create a hierarchal scheme that leaves diversity visa applications at the bottom. It merely alters the document submission requirements for a selectee seeking an interview, requiring the applicant only submit  a DS-260 to KCC as a prerequisite for interview scheduling. Dep't of State Bureau of Consular Affairs, *Diversity Visa 2022 Update*, https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-2022-update.html (last visited June 7, 2022). Thus, to the extent Count Three challenges an unlawful interpretation of the INA that *deprioritizes* diversity visas, as Plaintiffs summarized in their Response, [R. 49, pp. 17–18], Plaintiffs have failed to point to a policy or decision in effect that establishes (or hints) at a prioritization scheme. This alone is fatal to any deprioritization claim.

Count Four is equally opaque. There, Plaintiffs attack Defendants' decision-making regarding scheduling of interviews, arguing those decisions have "not been made in good faith, fail[] to consider relevant factors, and fail[] to comply with the regulatory process that governs the allocation, interviews, and issuance of diversity visas." *Id.* at 18. However, once again, Plaintiffs fail to point to a decision made that precipitated their conclusion. Instead, Plaintiffs

argue "[u]pon information and belief," that "Defendants have concluded that Congress requires the State Department to prioritize immediate relatives ahead of diversity visas." [R. 9, p. 43, ¶ 410]. It bears repeating that though the November 2020 prioritization guidance, under the Diplomacy Strong framework, formally favored visa applications for immediate family members to ensure family separation between American citizens and their spouses and children was kept to a minimum,[11] such guidance has been rescinded and replaced with the non-prioritizing CMP. *Gjoci*, 2021 WL 3912143, at *4 . Parsing through the ambiguity, Plaintiffs main gripe in Counts Three and Four is the speed that the Defendants are processing diversity visa applications. Stated differently, Plaintiffs wish to accelerate the Department's scheduling of interviews and processing of applications to ensure their applications are adjudicated before the statutory deadline. But as the Court discusses below, the timing and scheduling of interviews is firmly committed to agency discretion by law.

Counts Three and Four turn on whether Defendants have a non-discretionary duty to process diversity visas in the form, manner, and timeframe that Plaintiffs prefer. Defendants argue that the Court lacks subject-matter jurisdiction to hear two of Plaintiffs' four claims for several reasons [R. 31, pp. 18–30]. First, Defendants argue that, as to Count Three, Plaintiffs lack Article III standing to challenge the Secretary of State's December 2021 Decision. *Id*. at 19–23. Second, they believe Plaintiffs' Count Three fails to challenge final agency action. *Id*. at 18. Third, they argue that the Court lacks subject-matter jurisdiction over Plaintiffs' Counts Three and Four because Plaintiffs seek "programmatic relief." *Id*. at 23–25. Finally, they argue that the Court

---

[11] Defendants in their Motion to Dismiss acknowledge that Congress has indicated that an overall priority of the INA is family unification. [R. 31, p. 49]; *see also* Foreign Relations Authorization Act, Fiscal Year 2003, Pub. L. No. 107–228, § 233, 116 Stat. 1373 (Sept. 30, 2002) ("In the case of an immigrant visa application where the petitioner is a relative other than an immediate relative, it should be the policy of the Department to process such application within 60 days of receipt of all necessary documents from the applicant and the [INS].").

lacks subject-matter jurisdiction over Counts Three and Four because the Secretary's decision-making is committed to agency discretion. *Id.* at 25–30. The Court focuses solely on this final argument.

The APA establishes a basic presumption of judicial review for a plaintiff who has suffered a legal wrong because of agency action. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); 5 U.S.C. § 706(2)(A). This presumption is a strong one, and an "agency bears a 'heavy burden' in proving that Congress intended to preclude all judicial review." *Duncan v. Muzyn*, 833 F.3d 567, 576 (6th Cir. 2016) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)).  Review is not available, however, when the agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1128 (6th Cir. 1996).

"Section 701(a)(2) 'has caused confusion and controversy since its inception.'" *Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 25 F.4th 430, 445 (6th Cir. 2022) (internal citations omitted). A literal interpretation of § 701(a)(2) would preclude judicial review of any agency exercise of discretion, *see id.* (citing *Heckler v. Chaney*, 470 U.S. 821 829 (1985)), which conflicts with the statute's instruction to set aside agency actions that are "arbitrary, capricious, *an abuse of discretion*, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2)(A) (emphasis added). Considering § 701(a)(2) clearly contemplates judicial review of *some* discretionary agency actions, the Supreme Court has narrowed § 701(a)(2) to apply only if the statute does not provide a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Accordingly, if the statute does not provide a meaningful standard, review is unavailable as agency action would be committed to agency discretion by law. *See Madison-Hughes*, 80 F. 3d at 1127. "A meaningful standard does not exist where the

applicable law is so broadly drawn that the court has no standard of substantive priorities against which to measure an agency's discretion." *Id*. (citing *Cmty. Action of Laramie Cnty., v. Inc. v. Bowen*, 866 F.2d 347, 353 (10th Cir. 1989)); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (noting that § 701(a)(2) applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply'").

Plaintiffs, in their Response, detail the statutory provisions and regulations they presume provide a meaningful standard[12] in which the Court could judge the Department's exercise of discretion:

> Defendants' reliance on the narrow exception under Section 701(a)(2) fails because the statute directs that consular officers "shall" review visa applicants and "shall" allot diversity visas in accordance with detailed statutory standards. *See* 8 U.S.C. §§ 1153(c)(1), 1202(b). Defendants are further constrained by Congress's directive that "[t]he worldwide level of diversity immigrants is equal to 55,000 for each fiscal year," 8 U.S.C. § 1151(e), and the provision that lottery winners "shall remain eligible" until "the end of the . . . fiscal year" (and must receive their visas by that deadline). 8 U.S.C. § 1154(a)(1)(I)(ii)(II). Regulatory requirements further supplement those statutory directives for consular officers to issue decisions on visa applications. *See* 22 C.F.R. § 42.81(a); *see also* 22 C.F.R. § 42.33(c).

[R. 49, pp. 33–34]. These cited provisions, however, simply do not provide a meaningful standard for a reviewing court. To the contrary, the cited regulatory requirements denote agency discretion. The Court addresses these provisions— 22 C.F.R. § 42.81(a), 8 U.S.C. §§ 1151(e), § 1154(a)(1)(ii)(II), § 1153(c)(1), and § 1202(b)— in turn.

First, 22 C.F.R. § 42.81(a) demarcates the Department's discretion by requiring the reviewing consular officer to either "issue the visa, refuse the visa under INA 212(a) or 221(g) or other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting the visa." Inherent is the consular officer's discretion to determine the most appropriate action.

---

[12] As the Court will discuss below, Plaintiffs also fail to plausibly allege that Defendants have failed to comply with the cited statutory provisions and regulations. *See infra* Section IV(A)(2).

Section 42.33(c) merely outlines the procedures of the application process, stating that the "Department will then select in the rank orders determined by the computer program a quantity of petitions for each region estimated to be sufficient to ensure, to the extent possible, usage of all immigrant visas authorized under INA 203(c) for the fiscal year in question. The Department will consider petitions selected in this manner to have been approved for the purposes of this section." While § 42.33(c) likely provides a meaningful standard by which the Court could review whether the Department appropriately selected the computer-randomized petitions, the regulation *does not* provide a meaningful standard to analyze the agency's *timing* and *review* of petitions. Rather, § 42.33(c) implicitly endows discretion on the agency to manage the review of such petitions in a way that will "ensure, *to the extent possible*, usage of all immigrant visas." (emphasis added). Moreover, the regulation lacks any criteria or list of factors a reviewing court could utilize to judge whether the Department selected a quantity of petitions "to ensure, to the extent possible, usage of all immigrant visas." 22 C.F.R. § 42.33(c); *see Gibson v. L.K. Comstock, Inc.*, 900 F.2d 259 (Table), 1990 WL 47376, at *2 (6th Cir. 1990) (finding no meaningful standard when the statute and implementing regulations are "expressed in terms of permissive rather than mandatory language, do not list factors for the agency to use in reaching its determination, and specify no standards for a reviewing court to use in evaluating agency determinations").

Likewise, 8 U.S.C. § 1151(e) and § 1154(a)(1)(ii)(II) fail to provide a meaningful standard. The former simply sets the number of available diversity visas worldwide for each fiscal year. *See* 8 U.S.C. § 1151(e) ("The worldwide level of diversity immigrants is equal to 55,000 for each fiscal year."). The latter declares that applicants "who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa

only through the end of the specific fiscal year for which they were selected." 8 U.S.C.

§ 1154(a)(1)(ii)(II). The Seventh Circuit in *Shahi v. United States Dep't of State*, 33 F.4th 927

(7th Cir. 2022), recently addressed this provision. There, plaintiffs argued that

§ 1154(a)(1)(I)(ii)(II) set a deadline for administrative action and asked the Seventh Circuit to

hold that the Department owed a duty to adjudicate their visa application before the end of the

fiscal year. *Id*. at 929. Judge Easterbrook, writing for the Seventh Circuit, rejected plaintiffs'

argument, holding that § 1154(a)(1)(I)(ii)(II) "does not impose any duty on the State

Department" or "set a time limit for administrative action." *Id*. Instead, "it specifies the

consequence of delay: the applicant's eligibility for a visa expires." *Id*. Judge Easterbrook

concluded:

> A court is not authorized to substitute a different consequence, such as belated
> agency action, for the one chosen by Congress. A statute such as §
> 1154(a)(1)(I)(ii)(II) imposes the onus of delay on the aliens. Perhaps it would have
> been wiser for Congress to enact a deadline for administrative action—for why
> should people lose entitlements because of things outside their control?—but that's
> not the sort of statute on the books.

*Id*. The Court agrees with Judge Easterbrook. While it may have been preferable for Congress to

enact a statute that sets a deadline for administrative action, § 1154(a)(1)(ii)(II) does not do so.

Rather, it serves as a warning to the procrastinating diversity visa applicant. Accordingly, as

§ 1154(a)(1)(ii)(II) does not impose constraints on the agency, it does not provide a meaningful

standard to judge the agency's exercise of discretion.

Section 1153(c)(1) also does not provide a meaningful standard. Section 1153(c) broadly

describes the diversity visa program. Plaintiffs argue that the statute "dictates the detailed

standards for processing and adjudicating applicants for diversity immigrant visas." [R. 49,

p. 34]. Indeed, the subsection instructs the Department as to the regions in which visas may be

available, distinguishing between "high-admission states," "low-admission states in low-

admission regions," and "low-admission states in high-admission regions." 8 U.S.C. § 1153(c). It also determines the redistribution of unused visa numbers and the limitation on visas for natives of a single foreign state. *Id*. But § 1153(c) is silent as to the relevant issue of when diversity visa applications must be reviewed, when interviews must be scheduled, where the interviews must take place, and the overall day-to-day consular operations, including diversity visa processing. Further, nothing in the section cabins the Secretary's latitude to manage consular operations. *See* 8 U.S.C. § 1104. Not once are the words "interview" or "schedule" found in § 1153(c). The provision does not provide a timeline which diversity visa applicants must be interviewed. Nor does it instruct how the Department should prioritize scarce consular resources or organize its personnel. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibility."). In conclusion, § 1153(c)(1) offers no meaningful standard to judge the Department's exercise of discretion when processing immigrant visas.

Only 8 U.S.C. § 1202(b) remains, which requires a more detailed analysis. The statute states that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). Plaintiffs, fixated on the imperative command "shall," suggest this sentence in the statute provides a meaningful standard. [R. 49, p. 34 ("Congress spoke specifically about what it expected Defendants to do, and they accordingly cannot legitimately contend they enjoy the liberty of acting with unreviewable discretion." (citations omitted))]. On occasion, some courts, based on their interpretation of § 1202(b), have allowed challenges to survive this initial jurisdictional hurdle in the context of diversity visas "where Congress supplied a statutory deadline for adjudication, and the Secretary's prioritization scheme ignored that limit or otherwise rested on misinterpretations of law."  *Ramirez v. Blinken*, No. 21-CV-

22

1099 (CRC), 2022 WL 1795080, at *6 (D.D.C. Mar. 22, 2022) (citing *Gomez v. Biden* (*Gomez III)*, No. 20-CV-01419 (APM), 2021 WL 3663535, at *17 (D.D.C. Aug. 17, 2021) and *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 239–40 (D.D.C. 2021)). However, as the Court will explain, the circumstances in those cases, specifically *Gomez* and *Filazapovich*, differ vastly from the circumstances here.

The *Gomez* litigation began in the summer of 2020 when thousands of FY 2020 diversity visa applicants brought suit in the United States District Court for the District of Columbia, seeking preliminary injunctive relief requiring the Department to process diversity visa applications and requesting that the court reserve additional diversity visa numbers that could be issued to applicants after FY 2020 closed on September 30, 2020. *See Gomez v. Trump (Gomez I)*, 485 F. Supp. 3d 145 (D.D.C. 2020)*; Gomez v. Trump (Gomez II)*, 490 F. Supp. 3d 276 (D.D.C. 2020)*; Gomez v. Trump (Gomez III)*, No. 20-cv-1419 (APM), 2021 WL 3663535 (D.D.C. Aug. 17, 2021). Plaintiffs specifically challenged the Department's No-Visa Policy,[13] which suspended all processing and issuance of visas in categories covered by then-President Trump's Proclamation (including diversity visas), and defendants' implementation of the COVID-19 Guidance, which required posts to provide "emergency and mission critical visa services" but did not include diversity visa processing. *Gomez I*, 485, F. Supp. 3d at 157–61. Defendants argued that the COVID-19 guidance was not subject to judicial review under the APA because it is committed to agency discretion by law. *Gomez III*, 2021 WL 3663535, at *16. The court disagreed, finding a meaningful standard to judge the agency's exercise of discretion:

> And, unlike in the military context, the INA and the APA readily permit the court to identify what factors the State Department needed to consider. Congress's express directives in the INA include that "[a]ll immigrant visa applications" and

---

[13] When the court refers to the "No-Visa Policy" in this opinion it means the Department's legal position and policy that Proclamation 10014's restriction on entry, by operation of law, rendered diversity visa selectees ineligible to receive a diversity visa.

"[a]ll nonimmigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b), (d) (emphasis added). Accordingly, *while the State Department of course retained discretion to organize its priorities as necessary, it nonetheless remained obligated by Congress to carry out certain functions.* And once it took action to reorganize its priorities, the agency was required to act in accordance with the APA. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995) ("[T]he APA provides a default standard of judicial review—arbitrary and capricious—precisely for situations ... where a statute does not otherwise provide a standard of judicial review."). The court thus has available judicial standards by which to judge Defendants' conduct.

*Id*. at 17 (emphasis added).

In *Filazapovich*, the District Court of the District of Columbia consolidated three cases of FY 2021 diversity visa selectees (and derivative beneficiaries) seeking relief from the Department. 560 F. Supp. 3d at 216. Notably, for the first four-plus months of FY 2021 (October 1, 2020, to February 17, 2021), the Department refused to schedule consular-office interviews for 2021 diversity visa selectees because the agency continued to interpret then-President Trump's Proclamations as a bar on entry for diversity visa applicants. *Id*. at 220. On February 17, 2021, the agency lifted that suspension for 2021 diversity visa selectees who were documentarily qualified. However, interview scheduling was subjected to a four-tier prioritization scheme first adopted in November 2020. *Id*. Similarly to the plaintiffs in *Gomez I*, the *Filazapovich* plaintiffs challenged the Department's prioritization scheme. Defendants argued such challenge was impermissible because "'there is no meaningful judicial standard available for the Court to assess, especially in the context of an unprecedented backlog arising from a pandemic.'" *Id*. at 239–40. In rejecting defendants' argument, the court followed the same reasoning as the *Gomez* court, stating:

[T]here are meaningful standards by which the court can assess Defendants' prioritization policy because the INA and APA provide them. In the INA, Congress expressly directed that "[a]ll immigrant visa applications *shall* be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b) (emphasis added). Whatever else the State Department's prioritization policy accomplished,

> it needed to honor that directive. And in organizing its priorities, the State Department was required to act in accordance with the APA and not adopt a policy that was contrary to law or failed to consider important factors. *See* Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 n.12 (D.C. Cir. 1995) ("[T]he APA provides a default standard of judicial review—arbitrary and capricious—precisely for situations ... where a statute does not otherwise provide a standard of judicial review."). The State Department's prioritization policy is therefore reviewable.

*Id*. at 240. Thus, both *Gomez* and *Filazapovich* believed § 1202(b) offered a meaningful standard to judge the Department's exercise of discretion.

The Court declines to offer a position on the interpretation of § 1202(b) found in *Gomez* and *Filazapovich* because the facts in those cases are significantly different than the facts here. As mentioned, in *Gomez*, the No-Visa Policy completely suspended all diversity visa processing for FY 2020 applicants. *Gomez I*, 485, F. Supp. 3d at 157–61. In *Filazapovich*, the No-Visa Policy partially suspended FY 2021 diversity visa processing for approximately four months. 560 F. Supp. 3d at 220. Here, no such policy has affected Plaintiffs' diversity applications in any way. As previously mentioned, the Biden administration rescinded the prior administration's Proclamations before the 2022 Fiscal Year, removing such barrier for hopeful FY 2022 diversity visa applicants. *See* 86 Fed. Reg. 11,847 (Feb. 24, 2021). Thus, the Court may determine the issue before it without deciding what the most appropriate interpretation of § 1202(b) is. That's because, assuming the Department has an obligation to process diversity visa at some level, as held in *Gomez* and *Filazapovich*, § 1202(b) offers no meaningful standard for *how* it must undertake that obligation.

Section 1202(b) is completely silent as to the form, manner, and timeframe in which Defendants' must process diversity visa applications. Section 1202(b) is titled "Other documentary evidence for immigrant visa" and concerns the documentary evidence required to obtain a visa. 8 U.S.C. 1202(b). Within the subsection, consular officers are authorized to excuse

the documentary requirements in narrow circumstances. *Id*. And the final sentence of the subsection asserts that every application reviewed must be done by a consular officer, rather than some other person. Thus, "the [final] sentence appears to concern *who* reviews visa applications rather than whether all such applications must be reviewed (much less be reviewed by a certain time.)" *Zarei v. Blinken*, No. 1:21-cv-2102-CJN, Dkt. 23 at 3 (D.D.C. Sept. 30, 2021) (citations omitted) (emphasis in the original). Plaintiffs would prefer the Department quicken its pace, but even Plaintiffs fail to identify a meaningful standard couched in § 1202(b) outside the fact that applications "shall be reviewed and adjudicated by a consular officer." 8 U.S.C. § 1202(b). Moreover, Plaintiffs concede that they have no right to "an immigrant visa or a right to a certain schedule for interviews." [R. 49, p. 26]. In doing so, Plaintiffs inherently recognize that the Department's limitations and finite resources preclude every selectee from receiving an interview. In sum, § 1202(b) offers no timeframe for the scheduling of interviews or when applications must be reviewed. Accordingly, other than who shall review a visa application, the Court finds the form, manner, and timeframe in which Defendants schedule interviews and process applications to lie firmly within the discretion of the Department.

To the extent Plaintiffs target any alleged prioritization scheme, they also fail. First, as mentioned, the only current policies at play are the CMP and the December 2021 Decision, which do not prioritize immigrant visa applications, and most certainly do not deprioritize diversity visa applicants. Second, courts have found the Department's prioritization decisions to be committed to agency discretion by law. In *Ramirez*, the plaintiffs' prioritization claim challenged "the Secretary's four-tier system for application processing—announced publicly a week after the filing of the complaint—which places K visas in the second priority group." 2022 WL 1795080, at *5. The Court dismissed plaintiffs' claim, finding that the Secretary's

prioritization decisions were committed to agency discretion by law. *Id*. at 6. According to *Ramirez*, "there are no guiding principles the Court could use to evaluate the propriety of the Secretary's triage scheme." *Id*. In a similar case concerning the O Visa program, the District Court of the District of Columbia stated that "the determination and prioritization of 'mission critical' functions during a time of crisis and administrative triage lies squarely within the discretion of the Secretary of State, . . . and is not subject to judicial review." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 148 n.8 (D.D.C. 2021). *Ramirez* and *Tate*, along with this Court's decision that none of Plaintiffs' cited statutes or regulations offer a meaningful standard, are further supported by long-standing principles that caution for judicial restraint when invited to micromanage immigration law, "where the federal Legislative and Executive Branches, not the Judicial Branch, are the key drivers of national policy." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Fiallo v. Bell*, 430 U.S. 787, 792 ("Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (internal quotations and citations omitted)).

In *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State* (*LAVAS*), 104 F.3d 1349 (D.C. Cir. 1997), the plaintiffs challenged as discriminatory, as well as arbitrary and capricious, a Department "consular venue" policy, which required that the visa applications of certain Vietnamese and Laotian migrants be processed in their home countries. *Id*. at 1350. The Court rejected plaintiffs challenge, highlighting that "the broad language of the [INA] suggests that the State Department policy in unreviewable." *Id.* at 1353. According to the D.C. Circuit, "Congress has determined that '[e]very alien applying for an immigrant visa and for alien registration shall make application therefor in such manner *and at such place as shall be by*

*regulations prescribed.*" *Id.* (citing 8 U.S.C. § 1202(a)) (emphasis in the original). The *LAVAS* court interpreted that language to "grant[] the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured." *Id.* Section 1202(c) is equally as broad, providing that "[e]very alien applying for a nonimmigrant visa and for alien registration shall make application therefor in such form and manner as shall be by regulations prescribed."

These broadly worded provisions of the INA demonstrate how the "nature of the administrative action counsel against review" as Congress entrusted the Department with discretion to "balance[e] complex concerns involving security and diplomacy, Department resources and the relative demand for visa applications." *LAVAS*, 104 F.3d at 1353. The Court believes the Department may organize its resources based on external conditions, such as the COVID-19 pandemic, in the form and manner necessary according to the agency's expertise. *See Massachusetts v. EPA*, 549 U.S. at 527 ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibility."); *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 ("Absent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'"); *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."); *Shalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017) ("Congress has given the agencies wide discretion in the area of immigration processing."). Accordingly, the Court finds

the agency is the proper decision-maker as to this complex issue of immigration law and policy. In conclusion, the Court finds that it lacks subject-matter jurisdiction for Counts Three and Four.

### 2) 12(b)(6) – FAILURE TO STATE A CLAIM

Notwithstanding the Court's 12(b)(1) analysis above, Plaintiffs' Counts Three and Four must also be dismissed because they have failed to state plausible claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, are insufficient to plausibly state a viable claim. *See Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id*., nor must a court presume the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555. Accordingly, the Court considers Plaintiffs' allegations in Counts Three and Four to be impermissible, bald assertions that fail to state a plausible claim.

Count Three not only argues that Defendants' have deprioritized diversity visa applicants, but also that "Defendants have unlawfully issued visas to those who were not eligible and scheduled interview out of the regulatory-mandated order of consideration." [R. 49, p. 23]. To support this accusation, Plaintiffs rely exclusively on legal conclusions. *See Iqbal*, 556 U.S. at 678 That is, Plaintiffs fail to allege facts that support their naked assertions. For example, Plaintiffs claim the following:

> 396. Defendants have not issued visas to eligible qualified immigrants strictly in a random order established under the statute and the pilot program established for this fiscal year.

> 397. Defendants' unlawful actions have also contravened the regulations that "consideration for visa issuance . . . will be in the regional rank orders."

> 398. Defendants have not scheduled visa interviews in accordance with the law and regulations.

> 399. Defendants have issued visas to those who were not current for a visa.

400. Defendants have unlawfully manipulated the scheduling of interviews.

401. Defendants' actions are unlawful and without good cause.

402. Defendants' actions have caused, and will continue to cause, ongoing harm
to Plaintiffs.

[R. 9, pp. 41–42, ¶¶ 396–402]. These conclusions and generalizations are unadorned by

supportive facts. Plaintiffs make no attempt to explain how they know "Defendants have issued

visas to those who were not current for a visa," [R. 9, p. 42, ¶ 398], but instead expect the Court

to just accept their word. Because Count Three relies exclusively on conclusory statements, it is

insufficient and must be dismissed under 12(b)(6).

Count Four faces a similar fate. There, Plaintiffs argue that Defendants have "misapplied

the INA and failed to consider relevant factors, including the time-sensitive nature of diversity

visas" when processing diversity visas. [R. 49, p. 23]. As a preliminary matter, Plaintiffs fail to

plausibly state which statutory provisions have been violated by Defendants in Count Four. Due

to this failure, Plaintiffs have not stated a claim for relief. This, by itself, is grounds for dismissal.

*See Darby v. Childvine, Inc*., 964 F.3d 440, 444 (6th Cir. 2020) ("At this stage, we consider

whether the complaint states a claim for relief that is plausible . . .").

To support their argument in Count Four, Plaintiffs focus on historical statistics and

compare the Department's activity for the FY 2022 year with prior years, arguing the

Department has departed from its "historical treatment of diversity visa applicants." [R. 49, p.

23]. For example, Plaintiffs allege that "Defendants have previously issued 9% of all immigrant

visas to diversity visa applications, which would result in an issuance of 45,000 visas this year.

Defendants' pace of issuance has dropped from 9% of the historical rate of issuance to 1%." [R.

9, p. 43, ¶ 412]. Plaintiffs provide no further support for these numbers. Even assuming this fact

to be true, it does not support Plaintiffs' claim that the Department misapplied the INA and failed

to consider relevant factors. More importantly, Plaintiffs' own filings directly contradict Plaintiffs' assertions. Pursuant to the multiple Notices of Voluntary Dismissal filed in the record, Defendants have adjudicated 40 percent of the Plaintiffs' applications in this matter. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79]. More generally, as of June 23, 2022, the KCC had completed processing of 48,045 FY22 diversity visa cases, associated with 101,280 prospective applicants. [R. 64]. Thus, not only is Plaintiffs' assertion unsupported, but the record suggests it is inaccurate as well.

Ultimately, Plaintiffs' Count Four allegations fail to plausibly state a claim as to which statutes or regulations have been misapplied by Defendants. Rather than providing the support to reach their conclusion, Plaintiffs begin with broad arguments about Defendants' conduct and attempt to work backwards. For example, Plaintiffs allege:

> 411. Defendants have returned to a pre-2020 pace of issuance for immigrant visas that will, if continued, result in the issuance of at least 500,000 immigrant visas this year.

> 412. Defendants have previously issued 9% of all immigrant visas to diversity visa applicants, which would result in an issuance of 45,000 visas this year. Defendants' pace of issuance has dropped from 9% of the historical rate of issuance to 1%. This is not good faith.

> 416. Defendants are not implementing the DV program in good faith.

> 418. The statutory deadline and the consequences for diversity visa selectees, if anything, manifests Congress' intent to prioritize the issuance of diversity visas at a higher pace than other immigrant categories before of the year-end deadline.

[R. 9, pp. 43–44, ¶¶ 411–418]. But Plaintiffs' conclusory statements do not explain how Defendants have misapplied the INA or failed to consider relevant factors when processing diversity visa applications. Stated differently, Plaintiffs are not asserting facts. Rather, they are asserting legal conclusions that are masquerading as factual allegations. *See Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (recognizing that a "legal conclusion couched

31

as a factual allegation" need not be accepted as true on a motion to dismiss). Accordingly, both Counts Three and Four may also be dismissed for a failure to state a claim.

## B. COUNTS ONE AND TWO

### 1. COUNT ONE – UNLAWFULLY WITHELD INTERVIEWS

In Count One, Plaintiffs argue that "the Agency—through the KCC—has unlawfully withheld agency action because in violation of its own policy announcement, it has failed to schedule interviews upon receipt of complete, properly filed DS-260s in violation of its own internal policies." [R. 9, p. 31, ¶ 316]. The APA allows courts to compel agency action "unlawfully withheld" under narrow circumstances. 5 U.S.C. § 706(2)(A). An agency must have failed to perform a non-discretionary duty to act. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* (emphasis in original).

Here, Plaintiffs' focus is on the Department's December 2021 Decision, arguing that the "Agency must follow its own internal rules, policies, and guidelines." *Id.* at 31–32, ¶¶ 318, 322. Plaintiffs argue that the Department is unlawfully withholding interviews because there are available diversity visa appointments at consulates and embassies in Australia, yet Plaintiffs, who have submitted completed DS-260s, have not been scheduled for their interview. *Id.* ¶ 323. In addition, Plaintiffs contend that an "immigrant interview is a discrete and required action for issuance of an immigrant interview and the 8 U.S.C. § 1202(b) mandates that all applications for immigrant interviews *shall* be considered and adjudicated." [R. 49, p. 39].

First, Plaintiffs make no plausible claim based on the December 2021 Decision, which merely streamlined the document submission process. Dep't of State Bureau of Consular Affairs,

*Diversity Visa 2022 Update*, https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-2022-update.html (last visited June 7, 2022). On its face, the new policy promotes efficiency by easing the document requirement for selectees seeking an interview. *Id*. That is, the December 2021 Decision seeks to increase the number of interviews given by the Department, rather than withhold interviews. Nonetheless, Plaintiffs have not explained how the Defendants' violated the APA when implementing the December 2021 Decision.

Plaintiffs' unlawfully withheld argument is predicated on a faulty premise. As explained above, the cited language of § 1202(b) does not speak to the form, manner, or timeframe in which the Department must schedule interviews. *Supra* Section IV(A)(1). Rather, § 1202(b)'s final sentence dictates *who* must review a diversity visa application—a consular officer. *See* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer."). Thus, Plaintiffs' reliance on § 1202(b) is unavailing.

Plaintiffs cite no other authority supporting their contention that Defendants have a non-discretionary, mandatory duty to schedule their consular interview within a particular timeframe to allow their visa application to be fully processed by the fiscal year deadline. Pursuant to the limited number of available diversity visas, "Plaintiffs are not guaranteed to have their diversity visa applications adjudicated." *Filazapovich*, 560 F. Supp.3d at 244. Nor has Plaintiff cited authority that proves a particular visa applicant has a right to have his or her diversity visa adjudicated before the statutory deadline. *See Pushkar*, 2021 WL 4318116, at *10. In *Pushkar*, an individual Plaintiff sued Defendants for unlawfully withholding her interview, but the district court found that the argument "failed to demonstrate a likelihood of success on the merits."[14] 2021 WL 4318116, at *11. In reaching its conclusion, the court recognized that "Defendants

---

[14] Notably, the Court in *Pushkar* decided an Emergency Motion for a Temporary Restraining.

resumed processing visa petitions before Plaintiff filed her Complaint in this action and before her visa became 'current' as of June 1, 2021." *Id*. at 10. Similarly, it is undisputed here that no "Executive policies writ large [have] halted all diversity visa processing at the beginning of [FY 2022]." *Id*. Further, when Defendants filed their Reply on May 25, 2022, they noted that 52 Plaintiffs at the time had rank numbers that only became current after April 1, 2022 (41 on April 1, 2022, seven on May 1, 2022, and five on June 1, 2022), and as a result, those Plaintiffs were not even eligible to be scheduled for an interview prior to their rank numbers becoming current. [R. 60, p. 5]; *see also* Dep't of State Bureau of Consular Affairs, *Visa Bulletin for March 2022*, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2022/visa-bulletin-for-march-2022.html (explaining the rank numbers becoming current in April).[15] This means that even if Defendants could have scheduled interviews within the timeframe argued by Plaintiffs, it would not have been able to do so for numerous Plaintiffs. *See id.* Thus, the Court is unaware of any authority that suggests Defendants have a non-discretionary duty to schedule *these* Plaintiffs' interviews within a specific timeframe, if scheduled at all.

In sum, Plaintiffs have not alleged a plausible unlawful withholding claim. Plaintiffs unadorned allegations that the Department has "failed to schedule interviews upon receipt of complete, properly filed DS-260s," [R. 9, p. 31, ¶ 316], fail to meet the pleading standard and are furthermore undermined by the record created by Plaintiffs in this case. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79]. Plaintiffs have voluntarily dismissed 40 percent of the original 134 Plaintiffs to this action. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79]. In their Response, Plaintiffs highlight the status of Tiffany Gates, a Australian citizen seeking to immigrate to the United States, and argue that "[a] visa number has been current and immediately available to Ms.

---

[15] The Court takes judicial notice of this government website. *See* Fed. R. Evid. 201(b).

Gates since the inception of processing for DV2022, but the U.S. Consulate in Sydney, Australia, where she is assigned to interview has refused to interview any diversity visa applications this year." [R. 49, p. 29]. However, Ms. Gates was dismissed from this matter on July 27, 2022 because her diversity visa had been adjudicated—well before the statutory deadline. [R. 76]. Ms. Gates exemplifies Plaintiffs' brazen attempt to dictate the Department's timeframe with the scheduling of interviews. Ultimately, Plaintiffs have failed to cite any authority that vaguely suggests a particular diversity visa applicant has the right to have his or her interview scheduled a mere few months after "the inception of processing," [R. 49, p. 29], and have failed to plead facts plausibly demonstrating that Defendants have unlawfully withheld interviews.

Accordingly, the Court rejects Plaintiffs' obvious attempt to control the agency's timeline. It bears repeating that the statutory "scheme makes clear, '[t]hose selected for the [DV] program are not guaranteed to receive a visa—only the opportunity to apply for one.'" *Gorgadze*, 2021 WL 4462659, at *2 (quoting *P.K. v. Tillerson*, 302 F.Supp.3d 1, 3 (D.D.C. 2017)). That is, the statute envisioned that not all applicants would win the opportunity to immigrate permanently to the United States of America. Inherently, there would be some losers. Plaintiffs cannot circumvent this diversity immigration system by trying to label Defendants' conduct as unlawful withholding in violation of the APA. Consequently, Plaintiffs have failed to state a plausible claim for Count One.

### 2.   COUNT TWO – UNREASONABLE DELAY

Lastly, Plaintiffs' Count Two argues Defendants unreasonably delayed scheduling Plaintiffs' interviews in violation of the APA. *See* [R. 9, p. 32]. Federal law requires that agencies "within a reasonable time . . . shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). If agencies fail to do so, courts are authorized to compel agency action. 5

U.S.C. § 706(1). However, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton*, 542 U.S. at 64 (emphasis in original).

At the outset, Plaintiffs have not shown that Defendants have a nondiscretionary duty to schedule interviews for these particular Plaintiffs to have their diversity visa application adjudicated within a certain timeframe. Indeed, because the Department selected 63,753 selectees for Fiscal Year 2022, plus their derivative beneficiary spouses and children, totaling 118,513 prospective diversity visa applicants for the limited slots, *see* [R. 31, p. 18; R. 9, p. 10, ¶ 62; *See supra* note 3], many will not receive an interview or diversity visa. And there is no guarantee for either. *See Filazapovich*, 560 F. Supp.3d at 244 ("Plaintiffs are not guaranteed to have their diversity visa applications adjudicated. . . ."). Moreover, Plaintiffs' reliance on "cases [like *Gomez I*] in which preliminary injunctions were granted to plaintiffs whose diversity visa applications were severely delayed as a result of Presidential Orders or responses to the COVID-19 pandemic," *Zarei v. Blinken*, No. 1:21-cv-2102-CJN, Dkt. 23 at *3–4 (D.D.C. Sept. 30, 2021), are limited in relevance, if relevant at all, considering the vastly different circumstances of those cases compared to the matter before the Court. That is, *Gomez I* and *Filazapovich* evaluated Executive policies that halted all diversity visa processing, a policy that is not present here. *Gomez I*, 485, F. Supp. 3d at 157–61; *Filazapovich*, 560 F. Supp. 3d at 200. Given Plaintiffs' inability to cite authority asserting Defendants owe a nondiscretionary duty to Plaintiffs to schedule their particular application interview within a certain timeframe, the Court is unclear how Defendants' conduct is unreasonable pursuant to the law.[16] *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79].

---

[16] Notwithstanding, Plaintiffs' argument that the scheduling of *their* diversity visa application interviews has been unreasonably delayed lacks persuasiveness. Plaintiffs filed their Amended Complaint on February 18, 2022. [R. 9].

Nonetheless, the Court will assume Plaintiffs' have established a duty to schedule their

particular application interviews within a certain timeframe and turn to the *TRAC* factors to

determine if they have stated a plausible claim.

"When resolving whether an agency action has been unreasonably delayed, the federal

courts consider six factors from *TRAC v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)[.]" *Barrios Garcia*,

25 F.4th at 451. The *TRAC* factors include:

1. the time agencies take to make decisions must be governed by a rule of reason;
2. where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
3. delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
4. the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
5. the court should also not take into account the nature and extent of the interests prejudiced by delay; and
6. the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80. "A claim of unreasonable delay is necessarily fact dependent and thus sits

uncomfortably at the motion to dismiss stage . . . ." *Barrios Garcia*, 25 F.4th at 451  (quoting

*Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021)); *see also Mashpee Wampanoag*

*Tribal Council, Inc. v. Norton*, 357 U.S. App. D.C. 422, 336 F.3d 1094, 1100 (2003)

("Resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task

requiring consideration of the particular facts and circumstances before the court."). Given the

fact-dependent nature of unreasonable delay claims, some courts have held that a motion to

---

This means only a few months passed after the commencement of FY 2022 before Plaintiffs deemed Defendants' action or inaction unreasonable. Since the filing of their Amended Complaint, Plaintiffs have filed multiple Notices of Dismissals dismissing dozens of Plaintiffs from this action who have had their diversity visa application adjudicated or interview scheduled. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79].

dismiss is not the proper vehicle to decide the issue. *See Escalona v. United States Dep't of Homeland Sec.*, No. 1:20-CV-613, 2021 WL 5546710, at *6 (W.D. Mich. Aug. 23, 2021); *Andrade Carranza v. Cuccinelli*, No. 2:19–CV–03078–BHH–MGB, 2020 WL 6292639, at *6 (D.S.C. Mar. 23, 2020), *report and recommendation adopted*, No. 2:19-CV-3078-BHH, 2020 WL 5810516 (D.S.C. Sept. 30, 2020). However, "it is not uncommon for courts here to resolve unreasonable delay claims in visa adjudication cases on a Rule 12(b)(6) motion." *Xiaobing Liu v. Blinken*, 544 F. Supp.3d 1, 10 n.6 (D.D.C. 2021); *see also Desai v. U.S. Citizenship & Immigr. Servs.*, No. CV 20-1005 (CKK), 2021 WL 1110737, at *5 (D.D.C. Mar. 22, 2021) (listing visa adjudication cases that have found "enough facts to evaluate the *TRAC* factors now"); *Sarlak v. Pompeo*, No. 20-CV-35-BAH, 2020 WL 3082018, at *5 (D.D.C. June 10, 2020) (acknowledging the plaintiffs' argument that applying the *TRAC* factors at the motion-to-dismiss stage was premature, but deciding that "[n]evertheless, in cases like this one involving claims of unreasonably delayed waiver determinations, the *TRAC* factors have been generally employed at the motion to dismiss stage to determine whether a plaintiff's complaint has alleged facts sufficient to state a plausible claim for unreasonable administrative delay" (internal citations and quotation marks omitted)); *Mirbaha v. Pompeo*, No. 20-cv-299 (TJK), 2021 WL 184393, at *4 (D.D.C. Jan. 19, 2021) (applying *TRAC* factors to resolve the government's motion to dismiss attacking Plantiffs' unreasonably delay claim). Accordingly, the Court, as explained below, is confident it can resolve the issue applying the *TRAC* factors without need for more facts.[17]

---

[17] In their Response, Plaintiffs argue that "Defendants' improperly attach evidence outside the pleadings as a basis for their motion to dismiss under Rule 12(b)(6)." [R. 49, p. 13]. Plaintiffs seek to exclude the use of Defendants' affidavits at the motion to dismiss stage. *See id.* at 36–38. The Court has limited its focus to matters properly considered at the motion to dismiss stage, including matters for which the Court may take judicial notice under Fed. R. Evid. 201(b). Furthermore, specifically relating to Count Two, Plaintiffs detail the *TRAC* factors in their Amended Complaint and thoroughly address them in their Response. [R. 9, pp. 33–40 ¶¶ 334–385; R. 49, pp. 42–49]; *see also Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507 (6th Cir. 1999) (noting that documents that are not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings when documents are referred to in the complaint and are central to the plaintiff's claim).

a. *TRAC* One

The first factor favors the Defendants. Whether the Department has a "rule of reason … cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1102. Accordingly, Defendants must show an "identifiable rationale" governing their decisions. *Ctr. For Sci. in the Pub. Interest v. United States FDA*, 74 F.Supp.3d 295, 300 (D.D.C. 2014).

As Defendants note, the "availability of an interview to make a visa application depends on multiple factors, 'like rank number, consulate conditions and capabilities, and the effects of COVID-19 on the relevant immigrant visa processing backlogs.'" [R. 31, p. 34 (quoting *Gjoci*, 2021 WL 3912143, at *15)]. Seeking to adapt to the ongoing pandemic, the Department implemented the CMP, which takes a more holistic decision-making approach on determining workplace posture at consular facilities. [R. 31, pp. 23–24; R. 31-2, pp. 10-11, ¶ 18; 21 STATE 99942]; *see also supra* note 8. Consular posts determining their workplace posture now must review for local risk indicators, which includes COVID-19 community transmission; employee vaccination status; local hospital capacity; and, local conditions. *Id*. Lastly, the December 2021 Decision sought to streamline the application process by requiring selectees to submit only a DS-260 as a prerequisite for interviewing.[18] Dep't of State Bureau of Consular Affairs, *Diversity Visa 2022 Update*, https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-

---

[18] The record reflects the December 2021 Decision has worked in streamlining the application process for Plaintiffs. For example, in their Response, Plaintiffs state that there "are 23 plaintiffs in the *Preston* case who are winners of the 2022 diversity visa program whose cases are languishing at KCC awaiting assignment to the consulate in Sydney, Australia for interviews." [R. 49, p. 16]. However, the record now indicates that 18 out of the 23 Plaintiffs have been voluntarily dismissed because their applications have been adjudicated. *See* [R. 58; R. 69; R. 76].

2022-update.html. The Department explained the rationale behind the December 2021 Decision on its website[19]:

> Why are we making this change now? KCC pre-processed DV cases to ensure that DV applicants were well-prepared and secured all required documents prior to interview. This promoted efficiency at our consular sections and helped applicants demonstrate their eligibility. *The Department is opting for this change to use all available DV appointments*.

*Id*. (emphasis added). The provided rationales for resuming operations, and therefore the scheduling of interviews, are clear and identifiable. And again, neither measure halts nor creates a barrier to the scheduling of interviews.

In *Xiaobing Liu v. Blinken*, the court found that the defendants demonstrated an identifiable rationale by showing how they adjusted visa processing during the COVID-19 pandemic. 544 F.Supp.3d 1, 11 (D.D.C. 2021); *see also Pushkar*, 2021 WL 4318116 at *9 (finding that *TRAC* factor one favored Defendants). Specifically, the *Liu* defendants imposed constraints on processing operations after considering local conditions and restrictions, including local and national lockdowns; travel restrictions; host country quarantine regulations; and measures taken by embassies and consulates to contain the spread of COVID-19. *Id.* Here, Defendants have considered similar factors when deciding how to allocate resources and personnel in a safe and effective manner. *See* [R. 31, p. 24–26]. As mentioned prior, KCC acts in accordance with the CMP, which aids KCC in adapting to the ongoing pandemic by implementing a more holistic decision-making approach when determining workplace posture at consular facilities. *Id*. at 23–24. Overall, when determining facilities' workplace posture, and therefore, the availability of interviews, KCC considers, as noted by the Defendants, the

---

[19] The "Court may take judicial notice of Executive Branch statements and reports pursuant to Federal Rule of Evidence 201," *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 24 n.6 (D.D.C. 2018), which authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

following factors: rank number, consulate conditions and capabilities, the effects of COVID-19 on the relevant visa processing backlogs, COVID-19 community transmission, employee vaccination status, local hospital capacity, and local conditions. *Id*. Thus, even though the KCC has streamlined the application process by requiring selectees to only submit a DS-260 as a prerequisite for interviewing, *see* Dep't of State Bureau of Consular Affairs, *Diversity Visa 2022 Update*, https://travel.state.gov/content/travel/en/News/visas-news/diversity-visa-2022-update.html (last visited June 7, 2022), KCC must still take the necessary time and precautions to ensure visa processing is executed in the most effective way possible, especially given the world-wide upsets and threats of the COVID-19 pandemic.

Further, the Court is not persuaded by the Plaintiffs' only meaningful challenge to the first *TRAC* factor, which argues that the "2021 Update does not constitute a rule of reason because it has led to arbitrary results." [R. 9, p. 34, ¶ 337]. Plaintiffs assert that "Defendants have arbitrarily and capriciously scheduled and issued visas to lottery winners who are not eligible to receive visas ahead of others who have been eligible and qualified for months." *Id*. To demonstrate a lack of rule of reason, Plaintiffs point out that the U.S. Embassy in Sydney, Australia, at the time of filing their Amended Complaint, had conducted zero diversity visa interviews. [R. 9, p. 35, ¶ 350]. In *Ramirez*, plaintiffs argued that the Manilla Embassy failed to follow the stated priorities of the Department by pointing to the publicly available monthly reports of visas issued by type and by consular post over the last few years. 2022 WL 1795080 at *9. The Court found the data to be "at least consistent with the allegation that the Manilla Embassy was not following the reasonable prioritization scheme laid out by the Department."[20]

---

[20] The *Ramirez* court cautioned that the majority of the *TRAC* factors narrowly favored the plaintiffs. 2022 WL 1795080 at *12. Importantly, the court expressly narrowed its holding, stating:

> The plaintiffs have only stated a claim to the extent that they challenge the Department's failure to follow its stated, mandatory triage system—primarily at the Manilla Embassy, but potentially at

*Id*. This Court does not reach the same conclusion. First, Plaintiffs fail to explain how Defendants' conduct contravenes the December 2021 Decision (or the CMP, which is the other current policy relevant to this matter). That policy, as the Court has explained, merely streamlined the document submission requirements. Second, Plaintiffs' arguments are bare bones conclusions, and are merely speculative without concrete support. The lack of interviews in February 2022 only serves to highlight the lack of resources and competing demands on consulates due to external global events. *See* Reuters, *Covid-19: Australia's Biggest City Will Lock Down as Outbreak Spreads*, N.Y. Times, https://www.nytimes.com/live/2021/06/25/world/covid-vaccine-coronavirus-mask.[21] Finally, Plaintiffs own filings in the record contradict their argument that the U.S. Embassy in Sydney has conducted zero interviews. *See supra* note 18. Accordingly, the Court finds that Defendants have illustrated an "identifiable rationale" governing their decisions. *Ctr. For Sci. in the Pub. Interest*, 74 F.Supp.3d at 300.

### b. *TRAC* Two

The second factor, which  asks whether Congress has provided any timetable for agency action, is neutral. *TRAC*, 750 F.2d at 80. In *Gomez I*, the court concluded that while the INA does not provide an express timetable by which diversity visas must be processed, Congress indicated the speed by which it expects immigrant visas to be processed by setting a fiscal year cutoff. 485

---

the NVC or elsewhere. On summary judgment, the government will have an opportunity to challenge more fully these limited claims and the evidence underlying them. Given this narrow reading of the surviving claims, however, *the Court will not accept on summary judgment any argument from the plaintiffs about the pace of processing or the Department's overall allocation of scarce financial and personnel resources during the pandemic*.

*Id*. (emphasis added). Notwithstanding the stated holding, this matter is distinguishable from *Ramirez* in numerous ways. First, there is no "mandatory triage system" in place to be followed by Defendants in this matter. Second, the gravamen of Plaintiffs' Amended Complaint is the pace at which Defendants are conducting interviews, an issue the *Ramirez* court determined at the Motion to Dismiss stage and explicitly precluded from being argued at summary judgment.

[21] The Court takes judicial notice of this public document that is not subject to dispute. Fed. R. Evid. 201(b).

F.Supp.3d at 196. According to the *Gomez I* court, the fiscal year cutoff for processing diversity visas "manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline." *Id*. The Court finds *Gomez I*'s rationale to be logical, but also recognizes that "although Congress's inclusion of the September 30 deadline . . . indicates Congress's intent that diversity visas be adjudicated expeditiously, it by no means guarantees that all selectees' application will be processed by that deadline." *Pushkar*, 2021 WL 4318116, at *8. Rather, the fiscal deadline is better understood as a warning to applicants. *See Shahi*, 33 F.4th at 929 ("[§ 1154(a)(1)(I)(ii)(II)] does not set a time limit for administrative action … Instead it specifies the consequence of delay: the applicant's eligibility for a visa expires"). Accordingly, the Court recognizes that while Congress may have indicated a speed at which the Department should process visas, it did not set an obligatory timetable for agency action. *See Pushkar*, 2021 WL 4318116 at *9 ("Congress has conveyed its intent that a certain number of diversity visa applications be processed by the end of the fiscal year. However, there is plainly no statutory obligation requiring *all* visa applications to be processed, much less Plaintiff's particular petition." (emphasis in the original)). Therefore, the Court finds that this second factor is, at best, neutral.

### c. *TRAC* Three and Five

The third and fifth *TRAC* factors, which both consider the effects of the delay, "run together." *Milligan*, 502 F.Supp.3d at 319. "The third instructs that delays may be 'less tolerable when human health and welfare are at stake,' and fifth tells courts to consider 'the nature and extent of the interests prejudiced by the delay.'" *Ramirez*, 2022 WL 1795080, at *11 (quoting *In Re Core Commc'ns*, 531 F.3d at 855).

The Court finds that Plaintiffs have not demonstrated that the third *TRAC* factor weighs in their favor. Plaintiffs argue that the delay "is dire as Plaintiffs' will now lose their once-in-a-lifetime opportunity to immigrate to the United States." [R. 9, p. 37, ¶ 367]. Defendants acknowledge Plaintiffs' situation, yet argue that "advancing Plaintiffs' visa cases would simply benefit Plaintiffs to the detriment of other DV and immigrant visa applicants . . . ." [R.  31, p. 54]. Defendants also contend that the Court should not "second guess or find fault in determinations that each Chief of Mission has made about the health and welfare of an embassy's or a consulate's workforce during the global pandemic." *Id.*

Undoubtedly, without a diversity visa, Plaintiffs will be deprived of the opportunity to immigrate to the United States. However, "an order compelling Defendants to schedule Plaintiff[s'] interview would merely move Plaintiff[s] to the front of the queue." *Pushkar*, 2021 WL 4318116, at *9. Though Plaintiffs suggest differently, *see* [R. 9, p. 43, ¶ 415], immigrant visa processing relies on finite resources burdened by emergency external events, like the COVID-19 pandemic. It is inherently a "zero-sum game," as "[p]rocessing one category of immigrant visas necessarily results in the diminished resources for processing another category of visas." *Gjoci*, 2021 WL 3912143, at *13. And many others not involved in this matter face similarly difficult circumstances as they await adjudication of their visa applications. *See Mohammed v. Blinken*, 20-CV-3696 (TNM), 2021 WL 2866058, at * (D.D.C. July 8, 2021). Ultimately, the Court is not persuaded by the Plaintiffs here "because it is not just [Plaintiffs'] 'health and welfare' that the Court must consider, but also those of others similarly-situated." *Pushkar*, 2021 WL 4318116, at *9. Because Plaintiffs' situation presents dire human health and welfare stakes but their requested remedy functions to the detriment of other diversity visa applicants, the Court finds that this factor is neutral.

44

Notwithstanding, Plaintiffs succeed on the fifth factor. Without a diversity visa, Plaintiffs' chances of immigrating to the United States are bleak. The court in *Pushkar* found the fifth factor to favor plaintiff because "[*i*]*f* Defendants fail to schedule an interview and fail to process her visa by September 30 (that date has not yet passed), she would lose her opportunity to immigrate to the United States through this fiscal year's diversity visa program." 2021 WL 4318116, at *9 (emphasis in the original); *see also Gomez I*, 485 F.Supp.3d at 196 (recognizing that the "prejudice from delay is dire"). The same is true here. Thus, the Court finds the fifth factor in favor for Plaintiffs.[22]

### d. *TRAC* Four

The fourth factor "requires a court to account for the effects of expedited action on 'agency activities of equal or greater priority.'" *Xiaobing Liu*, 544 F.Supp.3d at 13 (quoting *Ghadami v. U.S. Dep't of Homeland Sec.*, No. 19-cv-397 (ABJ), 2020 WL 1308376, at *9 (D.D.C. Feb 25, 2021)). The D.C. Circuit has "refused to grant relief, even though all other factors considered in *TRAC* favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." *Mashpee Wampanoag Tribal Council, Inc*, 336 F.3d at 1100 (internal quotations omitted).

Plaintiffs argue that this is "not a matter of reordering 'competing priorities,'" but rather a matter of "returning the Agency to its trend and a rational attention to diversity visa applicants." [R. 9, p. 38, ¶¶ 372–373]. The Court, however, is not convinced for three reasons. First, such assertion ignores the external events that have understandably caused a significant immigrant visa backlog. *See Liu*, 544 F. Supp. 3d at 13 (finding factor four to be dispositive because "of the challenges presented by the COVID-19 pandemic, which has created unusual and extreme

---

[22] Though discussed under the "*TRAC 5*," Plaintiffs' arguments appear to implicate the sixth *TRAC* factor.

challenges for Defendants, on top of the typical bureaucratic hold ups"). Second, if the Court orders Defendants to direct resources to Plaintiffs, the result would undoubtedly "move all others back one space and produce no net gain." *Mashpee Wampanoag Tribal Council, Inc*, 336 F.3d at 1100 (quoting *In re Barr Labs., Inc.*, 289 U.S. App. D.C. 187, 930 F.2d 72, 75 (1991)); *see also Xiaobing Liu*, 544 F.Supp.3d at 13 (quoting *Shalka v. Kelly*, 246 F.Supp.3d 147, 154 (D.D.C. 2017)) ("Ordering Defendants to immediately schedule visa interviews for Plaintiffs and adjudicate their visas is 'the very type of agency action . . . that if compelled would presumably delay other adjudications.'"); *Pushkar*, 2021 WL 4318116, at *6 (finding the fourth factor favored defendants when the "practical effect of such order would allow Plaintiff to proceed to the front of the queue of other similarly-situated diversity applicants – and applicants of other visa categories – who have not yet received an interview appointment.").

Finally, the Court is hesitant to police and micromanage the Executive Branch in an area of law that has been clearly delegated to the political branches. *See Wang v. Blinken*, 3 F.4th 479, 483 (D.C. Cir. 2021) (recognizing that deference to the political branches is high in matters of immigration policy); *see also Robert v. Reno*, 25 F. App'x 378, 382 (6th Cir. 2002) (quoting *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)) ("[J]udicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'"); *Tate v. Pompeo*, 513 F. Supp.3d 132, 150 (D.D.C. 2021) ("Given this backlog and the continued suspension of routine operations around the world due to the pandemic, defendants correctly posit that deference to the State Department's priority-setting and prioritization of 'mission critical' functions is necessary."). Defendants claim that "[e]ach Chief of Mission has exercised their discretion in prioritizing consular services that are most emergent." [R. 31, p. 52]; *see also Desai v. USCIS*,

No. 20–CV–1005 (CKK), 2021 WL 1110737, at *7 (D.D.C. Mar. 22, 2021) (noting that the agency has a "unique—authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way" (quoting *In re Barr Lab's, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (internal quotation marks omitted)). The Court is not positioned to doubt these claims. Furthermore, "[a]ny such order would plainly interfere with the agency's 'unique—authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.'" *Desai v. USCIS*, No. 20–CV–1005 (CKK), 2021 WL 1110737, at *7 (D.D.C. Mar. 22, 2021) (quoting *In re Barr Labs., Inc.*, 930 F.2d at 76). Accordingly, the Court finds that precedent and the pressures on Defendants from external events decisively drive the fourth *TRAC* factor to favor Defendants.

e. ***TRAC* Six**

With regard to the sixth *TRAC* factor, the Court "need not find any impropriety lurking behind agency lassitude in order to hold the agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80. Plaintiffs argue there is circumstantial evidence of bad faith. Notably, under Count Four of the Amended Complaint, Plaintiffs explicitly argue that "Defendants are not implementing the DV program in good faith." [R. 9, p. 43, ¶ 416]. Plaintiffs cite numerous cases in which federal courts ordered the Department to adjudicate and process applications and argues that the "State is again scheduling interviews and making decisions at a record slow pace." [R. 9, p. 40, ¶ 383]. However, many of these cited cases, as Defendants highlight, pertain to the "Secretary's implementation of a proclamation issued by the President under 8 U.S.C. § 1182(f)—an issue not present here." [R. 31, p. 56]; *see also Xiaobing Liu*, 544 F.Supp.3d at 14 (concluding that a good-faith legal disagreement, such as the most appropriate interpretation of the INA and Presidential Proclamations, are hardly an impropriety that would weigh in plaintiffs'

favor). Regarding Plaintiffs' good-faith argument, they fail to allege facts that plausibly demonstrate a lack of good faith in the processing of diversity visas by Defendants. Notwithstanding the challenges presented by COVID-19 and other world events, the Department is undoubtedly scheduling and conducting interviews, as evidenced by the fact that numerous Plaintiffs have voluntarily been dismissed because their applications have been adjudicated. *See* [R. 25; R. 58; R. 67; R. 69; R. 76; R. 79]. While Defendants may not be processing visas at the Plaintiffs' preferred pace, the Court is not persuaded the sixth *TRAC* factor weighs in their favor.

After weighing all six factors, the Court ultimately concludes that Plaintiffs fail to state a claim of unreasonable delay under the APA. The Court is sympathetic to Plaintiffs' predicament. However, as stated above, Plaintiffs' problem, as alleged, "is a problem for the political branches to work out." *In re Barr Labs., Inc.*, 930 F.2d at 76. Accordingly, Plaintiffs have failed to state a plausible claim of unreasonable delay under Count Two.

## V.  CONCLUSION

The Court is sympathetic to Plaintiffs' desire to immigrate to the United States. However, they have failed to show that the Defendants are hindering this process. Counts Three and Four of Plaintiffs' Amended Complaint fail to establish subject-matter jurisdiction or state a plausible claim. Counts One and Two also fail to state plausible claims.

Accordingly, it is **HEREBY ORDERED** as follows:

1. Defendants' Motion to Dismiss **[R. 31]** is **GRANTED**.

2. Plaintiffs' Amended Complaint, **[R. 9]**, is **DISMISSED**, and this action is **STRICKEN** from the Court's docket.

3.  Plaintiffs' Motion for Summary Judgment, **[R. 82]**, Defendants' Motion for Summary

Judgment, **[R. 83]**, and Plaintiffs' Motion to Strike the Errata Sheet of Morgan Miles,

**[R. 81]**, are **DENIED** as moot.

This the 22nd day of August, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY